O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

CAPPELLO GLOBAL, LLC, a California Limited Liability Company; CH BUS HOLDINGS, LLC, a Delaware Limited Liability Company; MICHAEL HAGGERTY, an individual, and CAMDEN FINANCIAL SERVICES dba CAPPELLO GLOBAL, LLC,

                          Plaintiffs,

          v.

TEMSA ULAŞIM ARAÇLARI SANAYİ VE TİCARET A.Ş., formerly known as Temsa Global Sanayi ve Ticaret A.S., and TEMSA NORTH AMERICA, INC.,

                          Defendants.

Case No.:  2:19-cv-10710-MEMF-KS

**ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, MOTION FOR PARTIAL SUMMARY JUDGMENT [ECF NO. 129]**

    Before the Court is Motion for Summary Judgment filed by Defendants Temsa Ulasim Araclari Sanyi Ve Ticaret A.S. and Temsa North America, Inc. ECF No. 129. For the reasons stated herein, the Court hereby GRANTS IN PART the Motion for Summary Judgment.

/ / /

1

## I.   **Background**

### A.  Factual Background

The present action stems from a soured business relationship. Plaintiff CH Holdings, LLC, Defendant Temsa Ulasim Araclari Sanyi Ve Ticaret A.S., and non-party Main Street Capital Corporation were all part of a negotiation whereby Main Street Capital Corporation sought to purchase CH Holdings, LLC. After the deal fell through, Plaintiff Michael Haggerty, a shareholder of CH Holdings, LLC, pointed the blame at Defendant Temsa Ulasim Araclari Sanyi Ve Ticaret A.S., alleging that the company's actions caused the deal to fall through. Defendants deny the allegations.

### B.  Procedural History

Plaintiffs Capello Global, LLC ("Capello"), CH Bus Holdings, LLC ("CH Holdings"), and Michael Haggerty ("Haggerty," with CH Holdings, "Plaintiffs") commenced the instant action in the Superior Court of the State of California for the County of Los Angeles on November 6, 2019 against Defendant Temsa Ulasim Arclari Sanayi Ve Ticaret A.S. ("Temsa"). *See* ECF No. 1-1 ("Complaint" or "Compl."). Temsa removed the action on December 18, 2019. ECF No. 1.

On October 5, 2020, Camden Financial Services ("Camden") was added as a plaintiff and Temsa North America, Inc. ("TNA," with Temsa, "Defendants") was added as a defendant in the matter. ECF No. 65. On February 25, 2021, Capello, CH Holdings, Haggerty, and Camden filed the operative Second Amended Complaint against Temsa and TNA. ECF No. 78 ("SAC"). The SAC includes the following causes of action: (1) Breach of Contract brought by Capello, Camden, and CH Holdings against Defendant[1] (SAC ¶¶ 21–27); (2) Tortious Interference with Economic Relations brought by CH Holdings, Capello, Camden, and Haggerty against Temsa and TNA (*id.* ¶¶ 28–38); (3) Tortious Interference with Contractual Relations brought by CH Holdings, Capello, Camden, and Haggerty against Temsa and TNA (*id.* ¶¶ 39–48).

---

[1] The SAC does not specify against which Defendant the first cause of action is brought, but, as further elaborated in the Findings of Fact, the only Defendant that was a party to the contract at issue (the Letter Agreement) is Temsa. Moreover, the allegations relating to the first cause of action only name Temsa. SAC ¶¶ 21–27. As such, the Court analyzes the first cause of action as being against Temsa.

2

On August 29, 2024, Defendants and Plaintiffs CH Holdings and Haggerty filed the instant Motion for Summary Judgment. ECF No. 129 ("Motion" or "Mot."). The parties also filed Defendants' Joint Statement of Uncontroverted Facts and Genuine Disputes (ECF No. 129-1, "DSUF"), Plaintiffs' Joint Statement of Uncontroverted Facts and Genuine Disputes (ECF No. 129-2, "PSUF"), and a Joint Appendix of Written Declarations in Support of the Motion. ECF No. 130. The Joint Appendix includes the Declaration of James E. Regan, ECF No. 130-1 ("Regan Decl." or "Regan Declaration"), the Declaration of Stephen Loomis Bucklin, ECF No. 130-2 ("Bucklin Decl." or "Bucklin Declaration"), the Declaration of Cem Yazmanoglu, ECF No. 130-3 ("Yazmanoglu Decl." or "Yazmanoglu Declaration"), the Declaration of Michael Haggerty, ECF No. 130-4 ("Haggerty Decl." or "Haggerty Declaration"), and the Reply Declaration of James E. Regan, ECF No. 130-5 ("Regan Reply Decl." or "Regan Reply Declaration"). Defendants also filed a Separate Statement of Evidentiary Objections. ECF No. 129-3 ("Objections").

On September 26, 2024, Capello, Camden, Temsa, and TNA filed a stipulation whereby Capello and Camden dismissed all their claims against Temsa and TNA with prejudice. ECF No. 131. As such, the only Plaintiffs remaining in this action are Haggerty and CH Holdings (hereinafter, "Plaintiffs").

On October 1, 2024, Plaintiffs filed their Evidentiary Objections. ECF No. 133 ("Plaintiff's Objections"). On October 8, 2024, Defendants filed their Response to Plaintiffs' Objections. ECF No. 136 ("Defendants' Response").

The Court held the hearing on the Motion on October 10, 2024.

## II.    **Applicable Law**

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

3

Under Rule 56(a), a court also has authority to grant *partial* summary judgment, or "judgment on less than the entire case." 10B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2737 (4th ed. 2022) (citing Fed. R. Civ. P. 56(a)). Under Rule 56(g), a court that "does not grant all the relief requested by the motion . . . may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

A court must view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). "A moving party without the ultimate burden of persuasion at trial—usually, but not always, a defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). To carry its burden of production, the moving party must either: (1) produce evidence negating an essential element of the nonmoving party's claim or defense; or (2) show that there is an absence of evidence to support the nonmoving party's case. *Id.*

Where a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial. *Id.* at 1102–03. In such cases, the nonmoving party may defeat the motion for summary judgment without producing anything. *Id.* at 1103. However, if a moving party carries its burden of production, the burden shifts to the nonmoving party to produce evidence showing a genuine dispute of material fact for trial. *Liberty Lobby*, 477 U.S. at 248–49. Under these circumstances, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is no genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (internal quotation marks omitted). If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the motion for summary judgment shall be granted. *Id.* at

322 ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.").

A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *See id.* "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed." Fed. R. Civ. P. 56(e)(2). The Court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252. To carry its ultimate burden of persuasion on the motion, the moving party must demonstrate that there is no genuine issue of material fact for trial. *Nissan Fire*, 210 F.3d at 1102; *Celotex Corp.*, 477 U.S. at 323.

### III.   **Evidentiary Objections**

As an initial matter, the Court's Standing Order[2] provides a briefing schedule for an integrated motion for summary judgment briefing that contemplates that all the papers related to summary judgment shall be filed at the same time. Plaintiffs filed their evidentiary objections over a month after the parties filed the instant Motion. The Court will consider Plaintiffs' objections but reminds counsel to timely submit filings in the future.

Both parties raise several evidentiary objections to the opposing parties' evidence. Most of the objections fail, as the parties assert boilerplate objections based on hearsay and relevance that are

---

[2] Located at https://www.cacd.uscourts.gov/sites/default/files/documents/MEMF/AD/Civil%20Standing%20Order%2005.03.2024.pdf.

duplicative of the summary judgment standard itself. *See Sandoval v. County of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021). Furthermore, the Ninth Circuit has recognized that "'a party does not necessarily have to produce evidence in a *form* that would be admissible at trial, as long as the party satisfies the requirements of Federal Rules of Civil Procedure 56.'" *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir.2003) (quoting *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001 (emphasis added)). In other words, when evidence is not presented in admissible form at summary judgment but could be later presented in an admissible form at trial, a court may still consider the evidence for the purposes of summary judgment. *Id.* at 1037; *see also Celotex Corp*, 477 U.S. at 324 ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").

However, both parties mount a series of authenticity objections that the Court sustains. Specifically, Defendants object to several exhibits of email chains under Rule 901 of the Federal Rules of Evidence because the "email chain was originally produced by Temsa in discovery in Turkish" and "has been translated by an unverified source." *See, e.g.,* Defendant's Objections at ¶ 4. Rule 901 provides that "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. R. 901. "'[A]n objection to admission of evidence on foundational grounds must give the basis for objection in a timely way to permit the possibility of cure.'" *Sandoval*, 985 F.3d at 666. Here, Defendants gave the basis for the objection, and did so with enough time to permit Plaintiffs to cure the deficiency. Without a verification, it is not clear that the translated versions of the email are authentic—that is, that the translated version states what the original states. It is "well settled that unauthenticated documents cannot be considered on a motion for summary judgment." *Canada v. Blain's Helicopter's, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987). As such, given that these documents lack authentication the Court SUSTAINS Defendants' objections as to Exhibits 28, 32, 35, 47, and 49 of the Haggerty Declaration.

Plaintiffs also object to Defendants' evidence on authenticity grounds based on the fact that "Regan is defendants' counsel of record" and "provides no testimony showing that he has personal

knowledge sufficient to authenticate the document[s]." *See e.g.,* Plaintiffs' Objections at ¶ 3. The Court analyzes these objections in turn.

First, the Regan Declaration and the Regan Reply Declaration include several deposition transcripts as attachments. *See* Regan Decl. Exs. 2, 20, 21, 22; Regan Reply Decl. Exs. 5, 6, 7, 9, 13, 16. Insofar as these deposition transcripts are concerned, the Court find that these are sufficiently authenticated they identify the names of the deponent, the action, and include the reporter's certification. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 765, 774 (9th Cir. 2002) ("A deposition or an extract therefrom is authenticated in a motion for summary judgment when it identifies the names of the deponent and the action and includes the reporter's certification that the deposition is a true record of the testimony of the deponent."); *see, e.g.,* Regan Decl., at pp. 31, 35 (Deposition of Ural Inal as 30(b)(6) witness with relevant portions). Plaintiffs' objections to these exhibits are OVERRULED.

Additionally, Defendants filed a Supplemental Declaration of James E. Regan, ECF No. 136-1 ("Supplemental Regan Declaration" or "Suppl. Regan Decl.") with Defendants' Responses. The Supplemental Regan Declaration includes additional deposition transcripts that purport to lay the foundation for certain exhibits attached to the Regan Declaration and the Regan Reply Declaration. *See, e.g.,* Regan Decl., p. 2 ¶ 3. These deposition transcripts are properly authenticated as well, and properly authenticate several of the exhibits attached to the Regan Declaration and the Regan Reply Declaration. Specifically, the deposition transcripts authenticate Exhibits 9, 10, 16, 18, and 23 of the Regan Declaration and Exhibits 1, 2, 4, 8, 10, 11, 12, 14, and 15 of the Regan Reply Declaration. As such, Plaintiffs' objections to these exhibits are OVERRULED.

Next, Defendants assert that a handful of the documents Plaintiffs object to on authenticity grounds are self-authenticating because they are on company letterhead. *See, e.g.,* Defendants' Responses at ¶ 7. Because letterhead is a "inscription, sign, tag, or label purporting to have been affixed in the course of business and indicating origin, ownership, or control," Fed. R. Evid. 902(7),

the Court finds that these exhibits are self-authenticating. As such, Plaintiffs' objections to Exhibits 5, 6, 14, and 15 of the Regan Declaration are OVERRULED.[3]

Next, Defendants argue that certain documents were produced as attachments to the Haggerty Declaration, and as such, the authenticity objection is frivolous because Plaintiffs submitted and relied on the same documents. *See, e.g.,* Defendants' Responses at ¶ 1. Once evidence is authenticated by one party, it is authenticated with regard to all parties. *See Orr*, 285 F.3d at 775–76 ("We now hold that when a document has been authenticated by a party, the requirement of authenticity is satisfied as to that document with regards to all parties, subject to the right of any party to present evidence to the ultimate fact-finder disputing its authenticity."). Thus, Plaintiffs' objections to Exhibits 1, 7, 17, and 19 of the Regan Declaration are OVERRULED. [4]

Next, Defendants argue that some of the exhibits submitted in support of the Motion, like Exhibit 3 to the Regan Declaration, are authenticated because they were produced by Temsa during discovery. *See* Defendants' Objections at ¶ 3. However, the fact that a document was produced in discovery does not automatically authenticate the document. *See Orr*, 285 F 3d at 777–78 (finding that letters produced in discovery were not properly authenticated because they were introduced through counsel's affidavit, and counsel lacks personal knowledge of the documents). As such, the Court SUSTAINS Plaintiffs' objections to Exhibits 3, 11, 12, and 13 of the Regan Declaration and Exhibit 3 of the Regan Reply Declaration.

Defendants also argue that records from an arbitration between Temsa and CH Bus are self-authenticating. *See, e.g.,* Defendants' Responses at ¶ 5. Defendants argue that (1) Regan has personal knowledge of these exhibits because he received a copy of these documents as Temsa's counsel in the arbitration and (2) the records are self-authenticating. *See id*. In his declaration, Regan did not testify that he was Temsa's counsel in arbitration, so his declaration lacks the details needed to find that he has personal knowledge of these exhibits and can authenticate the exhibits. Moreover,

---

[3] The Court already found that certain exhibits objected to on this basis were otherwise properly authenticated and does not re-list those exhibits here.

[4] The Court already found that certain exhibits objected to on this basis were otherwise properly authenticated and does not re-list those exhibits here.

arbitration records are not listed among the categories of self-authenticating documents in Rule 902 of the Federal Rules of Evidence, and the cases that Defendants cite do not hold that arbitration documents are self-authenticating but discuss *business* documents on company letterhead. *See, e.g., Shores v. Centurion Incorporated*, No. CV 20-00759-PHX-DGC, 2022 WL 21756445, at *2 n.3 (D. Ariz. Jan. 5, 2022) (discussing self-authentication for documents on business letterhead). As such, the Court SUSTAINS Plaintiffs' objection to Exhibit 4 of the Regan Declaration.

To the extent the Court relies on other exhibits not mentioned thus far, the objections are OVERRULED.

### IV.    <u>Findings of Fact[5]</u>

#### A.  The Distribution Agreement between Temsa and CH Bus Sales, LLC

Plaintiff CH Holdings is a company with subsidiaries and divisions including CH Bus Sales, LLC ("CH Bus"). Haggery Decl. at p. 7, ¶ 18. CH Bus, through a series of agreements, was the exclusive distributor of Temsa's products in a territory that included the United States and Canada. Haggerty Decl. at pp. 21 (original Distribution Agreement between Temsa and CH Trading Company), 178 (Security Agreement between CH Bus Sales LLC and Temsa referencing an amended Distribution Agreement between the parties, indicating that CH Bus replaced CH Trading Company as Temsa's distributor).

At first, Temsa was happy with the arrangement, and CH Bus sold over 1,000 buses during its time as Temsa's exclusive distributor in the United States. DSUF ¶ 2; Regan Decl. at pp. 33:17–38:10 (Exhibit 2, Inal Deposition). However, in 2017, the relationship between the parties became strained, as CH Bus failed to pay certain invoices. Haggerty Decl. at pp. 443–45 (Exhibit 3, email chain), 461–62 (Exhibit 37, email chain). In April 2017, Temsa and Haggerty discussed potential partnership alternatives "between Temsa and CH." Haggerty Decl. at p. 260 (Exhibit 13, email chain). Temsa noted that its ideal preference was to establish a new company, TNA, and the existing

---

[5] The facts set forth below are taken from the DSUF, PSUF, and the various exhibits cited therein. To the extent that any statements of fact are omitted, the Court concludes they were not material to the disposition of this Motion. To the extent that any of the facts set below were allegedly disputed by the opposing party, the Court concludes that no actual dispute exists or that the adopted language resolves the dispute.

shareholders of "CH" would be shareholders of TNA alongside Temsa. *Id.* Another potential solution, which was not Temsa's "first priority" was a temporary extension of the Distribution Agreement, which was contingent on several conditions. *Id.* Temsa noted that if Temsa and "CH" could not agree on any of the alternative options, the "existing structure w[ould] continue until the DA [Distribution Agreement] is terminated in accordance with Article III of the DA." *Id.* at 261. On March 20, 2018, Temsa sent CH Bus two notices—a Notice of Termination as of Right, Regan Decl. at p. 46, and a Notice of Termination for Cause, *id.* at p. 48.

In late 2017, there were rumors going around that CH Bus was going out of business. Bucklin Decl. at p. 76:1–25 (Exhibit 3, Mongiovi, Jr. Deposition). At least one of CH Bus's clients, David Thomas Tours, approached a CH Bus representative about the rumors. *Id.* at p. 76:1–25 (Exhibit 3, Mongiovi, Jr. Deposition). On August 8, 2017, a Temsa representative visited David Thomas Tours to work on one of the coaches in David Thomas Tours's fleet. Haggerty Decl. at p. 370 (Exhibit 25, email chain).

### B. The Main Street Transaction

In December 2016, Capello, in its role as CH Holdings's financial advisor, initiated discussions with Main Street Capital Corporation ("Main Street") concerning a potential transaction between CH Holdings and Main Street (the "Main Street Transaction"). DSUF ¶ 5. Main Street was the only party in negotiations for a potential transaction with CH Holdings. DSUF ¶ 9. During this time, Colton Braud was the Managing Director of Main Street. DSUF ¶ 19. In initiating discussions, Capello provided Main Street with a Confidential Information Memorandum ("CIM"). Regan Decl. at p. 77 (Exhibit 9, email chain and attachments). The CIM describes CH Holdings as "a holding company . . . formed to hold wholly-owned subsidiaries CH Bus, Sales, LLC . . . and Coach Finance Group, LLC . . . ." *Id.* at p. 94.

From May to September 2017, CH Holdings and Main Street continued their discussions concerning the Main Street Transaction. DSUF ¶ 11. On May 10, 2017, Main Street and CH Holdings entered into a letter of intent ("LOI") regarding the recapitalization of CH Holdings. DSUF ¶ 10. The LOI included several conditions contingent to the closing of the Transaction, including but not limited to the "negotiation of acceptable floorplan financing for new and used equipment."

Haggerty Decl., at p. 310 (Exhibit 18, LOI). On May 16, 2017, Temsa provided CH bus with a "comfort letter" in which Temsa stated that it was supportive of the Main Street Transaction. Haggerty Decl. at p. 319 (Exhibit 19, letter). Throughout May 2017, Temsa and Capello discussed the Main Street Transaction. In relevant part, Capello stressed to Temsa that "MSC w[ould] be highly interested in exploring your [Temsa's] level of support on items such as the duration of the extension of the term of the DA [Distribution Agreement]," and indicated that MSC was interested in understanding Temsa's position as to the Distribution Agreement. Haggerty Decl. at pp. 321 (Exhibit 20, email chain), 326 (Exhibit 21, email chain). Main Street also noted its desire to partnership with Temsa in materials put together by Main Street. *See* Haggerty Decl. at p. 339 (Exhibit 23, presentation) ("Main Street is enthusiastic about the opportunity to partner with TEMSA . . . through its investment in CH Bus.").

In June 2017, Temsa, Main Street, Capello, and CH Holdings met in Newark, New Jersey to discuss the Main Street Transaction. PSUF ¶ 55.[6] After the meeting, Artin Sedighan of Capello sent an email to Temsa stated that "we all left the meeting enthusiastic about the prospects of a TEMSA partnership in CH." Haggerty Decl. at p. 344 (Exhibit 24, email chain).

On July 4, 2017, Temsa and Capello entered into an agreement (the "Letter Agreement") in connection with a transaction whereby Temsa or its affiliates would purchase the majority of shares in CH Bus ("Temsa Transaction"). DSUF ¶ 12. The Letter Agreement included a non-solicitation clause restricting Temsa's ability to contact CH Bus's employees, agents, suppliers, customers, banks, or lenders. Haggerty Decl. at p. 48 (Exhibit 1). CH Holdings is explicitly referenced as a third-party beneficiary of the Letter Agreement. PSUF ¶ 63.

In internal emails, Capello noted that it seemed "Temsa . . . [was] seeking to be obstructionist with no real intention to close," and that "Sabanci's [Temsa] [doubtful] level of support for its distributor [CH Bus]" would "increase MSC's [Main Street's] perception of risk" to the detriment of the Main Street Transaction. Haggerty Decl. at p. 402 (Exhibit 29, email chain). In August 2017, Capello informed Temsa that it would go ahead with the original Main Street Transaction, and if, at

---

[6] The parties appear to dispute that, at the meeting, when Temsa was asked if they would extend the Distribution Agreement, Temsa did not answer. PSUF ¶ 57.

a later time, Temsa would like to acquire equity in CH Holdings or its subsidiaries, both CH Holdings and Main Street would welcome such a transaction. Haggerty Decl. at p. 394 (Exhibit 28, email chain).

On August 10, 2017, Main Street presented Capello with a Proposal outlining the terms and conditions for closing the Main Street Transaction (the "Proposal"). Haggerty Decl. at p. 419 (Exhibit 30, Proposal). The Proposal included a set of conditions to closing the Main Street Transaction, including but not limited to "Main Street's review of Borrower's [CH Holdings] intercreditor agreements related to floorplan financing for new and used equipment as well as the financing of Coach Finance Group, LLC." Haggerty Decl. at p. 423 (same as previous). In September 2017, Capello, in discussion with CH Bus representatives, including Haggerty, indicating that Capello and CH Holdings "should not signal to Temsa that a deal with MSC is hung up on a flooring issue." Regan Decl. at p. 277 (Exhibit 18, email chain).

In November 2017, Main Street decided to abandon the Main Street Transaction. DSUF ¶ 16.

### C. Google

At some point, Google leased Temsa motorcoaches from CH Bus. DSUF ¶ 26. Google complied with the terms of all its lease agreements with CH Bus, paying all amounts due. DSUF ¶ 28. Once Google's lease agreements with CH Bus lapsed, Google decided not to lease additional Temsa motorcoaches, from CH Bus or anyone else, because the majority of Google's motorcoach fleet was from a different manufacturer. DSUF ¶¶ 26, 28.

### V.    Discussion

Defendants argue that they are entitled to summary judgment as a matter of law because: (1) CH Holdings's claim for breach of contract fails because CH Holdings cannot show that Temsa's alleged breach caused CH Holdings any damages; (2) Plaintiffs do not have standing to bring tortious interference claims; (3) Plaintiffs' tortious interference with prospective economic advantage claim fails because Plaintiffs cannot show a disruption of an economic relationship; (4) TNA cannot be held liable for tortious interference because it did not exist at the time of the alleged conduct; (5) Temsa cannot be held liable for tortious interference because it is not a stranger to the

relationships with which it allegedly interfered; and (6) Plaintiffs tortious interference with contract claim fails because Plaintiffs cannot show the breach or disruption of any contract.

The Court addresses each argument in turn.

### A. Temsa Is Not Entitled to Summary Judgment on CH Holdings's Breach of Contract Claim (First Claim).

Establishing a breach of contract claim "requires a showing of '(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff.'" *D'Arrigo Bros. of Cal. v. United Farmworkers of Am.*, 224 Cal. App. 4th 790, 801 (2014).

Plaintiffs' claim for breach of contract centers around Temsa's alleged violation of the non-solicitation clause in the Letter Agreement. SAC ¶¶ 23–27.[7] The non-solicitation clause provides as follows:

> 3. Non-Solicitation. Without our written consent, neither you nor any or your Representatives shall make any contact with any employee, agent, supplier, customer , bank, or lender of the Company [CH Holdings] with respect to the Transaction provided however that nothing contained herein shall preclude you and/or your Representatives from making contact with the Company or its employees, agents, suppliers, customers, banks, or lenders the extent such contact is limited to conduct of your business in its ordinary course consistent with existing practices. Without our prior written consent, you and your Representatives will not for a period of 2 (two) years from the date of this Agreement directly solicit for employment or, within 1 (one) year after the date hereof, employ any person who is now employed as an officer of the Company or any of its divisions or subsidiaries. Nothing contained herein shall preclude the hiring at any time of any such employee who responds to a general solicitation of employment through an advertisement not targeted specifically at the Company or its employees.

Haggerty Decl. p. 381 (Exhibit 26, letter).

Plaintiffs claim that Temsa breached the Letter Agreement by soliciting various "banks, customers, lenders employees, business partners and/or entities under contract with and and/or with

---

[7] At the hearing, Plaintiffs argued that their breach of contract claim is also supported by a non-disclosure provision which Temsa allegedly violated. The Court asked Plaintiffs if this theory was pleaded in the SAC, and Plaintiffs answered in the affirmative. Although the entire Letter Agreement is attached to the SAC, and is thus part of the pleading, the only breach that Plaintiffs refer to in the SAC is the breach of the non-solicitation clause. *See* SAC ¶ 23. As such, Plaintiffs did not plead breach of the Letter Agreement's non-disclosure clause and this cannot form the basis of Plaintiffs' claims. Moreover, this argument was not included in the briefing, but brought up for the first time at the hearing.

business relationships with CH [Holdings]." SAC ¶ 23.[8] This breach caused CH Holdings's business relationships with Main Street, Google, and Wells Fargo to deteriorate and fall apart, causing injury to CH Holdings. *Id.* ¶¶ 25–26.

Defendants argue that Temsa is entitled to summary judgment on the first cause of action because CH Holdings cannot show, at a minimum, that Temsa's alleged breach caused the damages CH Holdings complains of. Mot. at 7. In its opposition, CH Holdings states that its breach of contract claims seeks damages relating to the collapse of the Main Street Transaction, as well as the loss of several clients such as Google. The Court first considers the Main Street Transaction and then the loss of clients such as Google.

> i. <u>Temsa's alleged breach did not cause the abandonment of the Main Street Transaction.</u>

Defendants argue that the testimony of Colton Braud, the managing director of Main Street, establishes that there is no genuine dispute of material fact that Temsa's alleged breach of the Letter Agreement—via solicitation—did not lead to Main Street's abandonment of the Main Street Transaction:

> Q. And then the next paragraph 17 says, "After executing the letter agreement, on July 4th, 2017, before July 4th, 2018, Temsa and its representatives began soliciting customers and contacting banks of CH Bus Holdings, LLC, including, but not limited to, Google, Wind Transportation and Wells Fargo." Do you see that?
>
> A. I do.
>
> Q. Do you, sir, have any knowledge as to whether or not the statement in paragraph 17 is true or false?
>
> A. I do not.

---

[8] In the briefing, Plaintiffs explicitly mention Google as a customer that Plaintiffs lost due to Temsa's breach of contract. However, the record does not reveal the exact date that Google decided to stop leasing buses from CH Bus, and only shows that it was likely sometime after the summer of 2018, as Google was still receiving services from CH Bus at that time. Regan Decl. at p. 333:2–16 (Exhibit 22, Ross Declaration). The loss of Google can serve as a basis for CH Holdings's breach of contract claim. Plaintiffs also mention that Temsa "improperly" contacted David Thomas Tours (presumably, improper due to the non-solicitation clause in the Letter Agreement). *See, e.g.,* Mot. at 5. However, the only interaction between David Thomas Tours and Temsa that Plaintiffs cite is that occurring on June 28, 2017, before the Letter Agreement was entered into. *See* PSUF ¶ 59. This cannot form the basis of CH Holdings's breach of contract claim because it occurred before the Letter Agreement was entered into.

Q.· ·So -- and to drill down on that, do you have any knowledge as to whether or not, between July 4th, 2017,·and July 4th of 2018, Temsa or its representative solicited customers and contacted banks of CH Bus Holdings?·Do you know whether that happened or not?

A.· ·I do not.

Q.· ·Okay.· And then paragraph 18 says, "After executing the letter agreement on July 4th, 2017, and before July 4th, 2018, Temsa and its representatives solicited various employees and officers of CH Bus ·Holdings, LLC in its divisions and subsidiaries in violation of the terms of the letter agreement." Do you see that, sir?

A.· ·I do.

Q.· ·Do you have any information as to whether or not this statement in paragraph 18 is true or false? ··

A.· ·I do not. ·

Q.· ·Do you have any knowledge as to whether or not, between July 4th, 2017, and July 4th, 2018, Temsa and its representatives solicited employees and officers of CH Bus·Holdings and its divisions and subsidiaries? ·

A.· ·I do not.

Q.· ·Okay.· It then goes on to say, "In late November of 2017, Main Street Capital abandoned its efforts to acquire CH Bus Holdings, LLC due to the acts and/or omissions of Temsa and its representatives." ·Do you see that, sir?
A.· ·Yeah.

Q.· ·Is -- is that, in fact, the reason why CH Bus·Holdings, LLC abandoned its efforts -- let me start over, sir.· I -- I inverted my words. Is -- is -- is it, in fact, true, sir, that Main Street Capital abandoned its effort to acquire CH Bus Holdings, due to the acts or omissions of Temsa or its representatives?

A.· ·I can't speak specifically to the acts and/or omissions. Temsa's lack of consent was a contributing factor but was not the sole factor in our decision to not further pursue the transaction.

Q.· ·Okay.· So let me ask this question, sir:· Did·Main Street Capital abandon its efforts to acquire ·CH Bus Holdings because Temsa solicited employees of -- ·

A.· ·No. ·

Q.· ·--- CH Bus Holdings or its subsidiaries? ·

A.· ·No.· That's not -- no.

Q.· ·Did – I'm sorry, sir.· Please -- please finish your answer.

A.· ·No, that was not -- that is not the reason.

Q.· ·Okay.· Did Main Street Capital abandon its effort to acquire CH Bus Holdings because Temsa contacted customers of CH Bus Holdings or CH Bus Sales?

A.· ·No.

Q.· ·Did Main Street Capital abandon its efforts to acquire CH Bus Holdings because Temsa contacted banking institutions with which CH Bus Holdings or its subsidiaries had a relationship?

A.· ·No.

. . .

[Q:] But -- and just to -- just to make sure I'm – I'm sure, sir, I asked you before if you knew, but in -- in November of 2017, do you -- did you have any idea as to whether or not Temsa was contacting CH Bus Holdings' employees? ·

A.· ·I did not, no.

Q.· ·Okay.· And -- and did you have any idea as to whether Temsa was contacting CH Bus Sales or CH Bus Holdings' customers?

A.· ·I did not . . . .

Q.· ·And it certainly didn't impact Main Street's decision on whether to go forward with the deal, right?

A.· ·No, it did not.

. . .

Q.· ·So if we go back to paragraph 25, it says, in -- in sum and substance, that the reason why the relationship between Main Street Capital and CH Bus Holdings deteriorated and ultimately collapsed in November of 2017, was because, among other things, Temsa's solicitation of clients, customers and employees. My question for you, sir:· Do you agree or disagree with that statement?

A.· ·I disagree with that statement.

Regan Decl. at pp. 294:10–13 (Exhibit 20, Braud Deposition), 306:2–308:19 (same), 309:2–19 (same), 311:2–10 (same).

In response, Plaintiffs argue that Defendants' conduct constituting a breach of contract need only be a *substantial* factor in causing the damages, not the sole factor. Mot. at 11. Plaintiffs point to Braud's testimony that "'Temsa's lack of consent *was a contributing factor but was not the sole factor* in our decision to not further pursue the transaction,'" and argue that this testimony creates a triable issue of fact as to whether Temsa's breach of the Letter Agreement caused Plaintiffs' damages resulting from the collapse of the Main Street Transaction. Mot. at 12 (emphasis added). However, Plaintiffs' argument is misplaced because the issue is not whether any act of Temsa's was a contributing factor to Plaintiffs' harm, but whether Temsa's conduct constituting a *breach of the*

*Letter Agreement* was a contributing factor to Plaintiffs' harm. Mot. at 13 ("Second, Temsa's 'lack of consent,' even if true, cannot be a legally recoverable cause of damages because the contract under which Plaintiffs are suing does not require it.") (emphasis in original). Although Braud testified that Temsa's lack of consent was a contributing factor to Main Street's decision not to pursue the Main Street Transaction, as Defendants point out, Temsa's "consent" was not an obligation under the contract and "'[a] claim for breach of contract [ ] must be based on the non-performance of *express promises or legal duties contained in a contract*.'" Mot. at 13 (citing *Dean v. Kaiser Foundation Health Plan, Inc.*, 562 F. Supp. 3d 928, 935 (C.D. Cal. 2022) (emphasis added); *see D'Arrigo Bros.*, 224 Cal. App. 4th at 801 (elements of a breach of contract include the defendant's breach and *resulting* damages to the plaintiff); CACI 303 (element of breach of contract claim includes element that defendant "failed to do something that the contract required . . . [Defendant] to do").[9] Moreover, Plaintiffs do not offer any evidence undermining or otherwise contradicting Braud's testimony that Temsa's alleged solicitation did not cause the collapse of the Main Street Transaction. As such, the Court finds that there is no genuine dispute as to whether Temsa's alleged breach of contract caused CH Holdings damages in the form of the abandonment of the Main Street Transaction—it is undisputed that it did not.

        ii.   <u>Temsa's alleged breach did not cost CH Holdings Google as a client.</u>

    Defendants also argue that to the extent Plaintiffs seek damages for more than just the loss of the Main Street Transaction, the undisputed evidence shows that Temsa's alleged breach—namely,

---

[9] In the SAC, CH Holdings based its first cause of action on Temsa's breach of the non-solicitation clause, and did not include any allegations as to Temsa's "lack of consent." SAC ¶¶ 21–27. However, in its opposition, CH Holdings includes no argument that Temsa's conduct allegedly violating the non-solicitation clause caused damages to CH Holdings, other than CH Holdings's reference to "loss of customers," such as Google. *See* Mot. at 11–12. The Court thus interprets CH Holdings's position as alleging a breach of contract based on Temsa's "lack of consent" referenced by Main Street, as well as Temsa's alleged conduct that caused CH Holdings to lose its clients. Moreover, to the extent CH Holdings intended to argue that Temsa's conduct constituting an alleged breach of the non-solicitation clause resulted in the collapse of the Main Street Transaction, the outcome would not be different. Defendants carried their initial burden by pointing to Braud's testimony indicating that Braud was unaware of any solicitation and that Main Street did not abandon the Main Street Transaction due to any such conduct. Mot. at 9–10. Plaintiffs, however, do not point to any evidence creating a genuine issue of triable fact that Temsa's alleged solicitation played any role in Main Street's decision to forego the Main Street Transaction, and as such, did not carry their burden of showing a genuine dispute of material fact exists.

the solicitation of Google and other clients—did not cause these damages either. Defendants have therefore demonstrated that there is no genuine dispute as to the element requiring that the defendant's breach caused resulting damages to the plaintiff. As is undisputed by Plaintiffs, Ross Benson, the Transportation Project Manager of Google, testified that Google decided not to renew its lease of Temsa coaches with CH Bus because the rest of Google's fleet was a different manufacturer, and it did not make business sense to do so:

> Q.· ·At some point in time Google did stop doing business altogether with CH Bus with respect·to service and repair of its Temsa buses; right? ·
>
> A.· ·That's right.
> ·
> Q.· ·And do you remember when that happened?
>
> A.· ·I don't recall the specific dates . . . . And at that point we had an existing maintenance vendor dealing with the rest of our fleet; so it made -- it just didn't make sense anymore for us to kind of·have a little carve out, you know, for the Temsa coaches.

Regan Decl., p. 332:5–18 (Benson Deposition).

The undisputed evidence thus shows that any loss of Google as a client did not stem from Temsa's breach of the Letter Agreement.[10] Plaintiffs point to Haggerty's testimony as showing a genuine dispute of fact:

> Moreover, buses are like computer printers. The cost of the printer is significant but the buses need a lot of repairs and a lot of parts, which is very lucrative. To do this CH Holdings and the companies under its umbrella about 35 employees and 6 locations, such as an important location in Burlingame, California to service the buses leased to Google, an important customer of CH Holdings. The Google account alone generated at least $100,000 dollars per month. CH Holdings was a massive enterprise that was reduced to nothing through the acts of Temsa, as will be described in detail below.

Haggerty Decl. at ¶ 33. But the amount of money that Google generated per month, or that CH Holdings was "reduced to nothing through the acts of Temsa" does not create a genuine dispute that the loss of Google as a client was due to Temsa's conduct constituting a breach of the letter agreement because it does not speak to such conduct. Finally, insofar as other clients are concerned,

---

[10] Defendants note that Google was a client of CH Bus, not CH Holdings, and points to a letter from CH Bus to Google. Mot. at 14 n.7. As the Court found above, *supra* § IV(A)(i), CH Holdings does not have standing to pursue claims resulting in damages to its subsidiaries. This would serve as an independent basis to find that Temsa is entitled to summary judgment on CH Holdings's breach of contract claim insofar the claim concerns the loss of Google as a client.

1  Plaintiffs do not point to any evidence on the record in support of their argument that Temsa's

2  breach caused them to lose business with other clients. As such, the Court finds that there is no

3  genuine dispute as to whether Temsa's alleged breach of contract caused CH Holdings damages in

4  the form of the loss of clients such as Google.

5             iii.   CH Holdings may be entitled to nominal damages.

6         Finally, CH Holdings argues that even if it has not shown that Temsa's alleged breach led to

7  the loss of the Main Street Transaction or its other relationships, CH Holdings can still maintain its

8  breach of contract claim because it is entitled to nominal damages. Mot. at 12.

9         Under California Civil Code section 3360, "[w]hen a breach of duty has caused no

10  appreciable detriment to the party affected, he may yet recover nominal damages." Cal. Civ. Code §

11  3360. California courts have stated that "[a] plaintiff is entitled to recover nominal damages for the

12  breach of a contract, despite inability to show that actual damage was inflicted upon him." *Sweet v.*

13  *Johnson*, 169 Cal. App. 2d 630, 632 (1959). Defendants argue that CH Holdings's authorities are

14  outdated, and point to a non-binding case, *Mortgage Electronic Registration Systems Inc. v.*

15  *Johnston*, which stated that "[t]o be actionable, contractual damages must constitute something more

16  than nominal damages." *Mortgage Electronic Registration Systems Inc. v. Johnston*, No. CV 15-

17  4853-PA, 2016 WL 11527172, at *6 (C.D. Cal. Nov. 22, 2016) ("*Johnston*"). *Johnston*, in turn,

18  relied on *Buttram v. Owens-Corning Fiberglass Corp.*, where the Supreme Court of California stated

19  that "[g]enerally speaking, to be actionable, harm must constitute something more than nominal

20  damages, speculative harm, or the threat of future harm—not yet realized . . . ." 941 P.2d 71, 77 n.4

21  (Cal. 1997). However, *Buttram* does not support the conclusion reached by *Johnston*, as the relevant

22  quote from *Buttram* was in explaining principles of actionable harm in the *tort* context. *Id.* at pp. 72,

23  77 n.4 (discussing harm for the purposes of the accrual of the state of limitations in products liability

24  case). *Buttram* did not consider whether nominal damages are available in the absence of actual

25

26

27

28

damages for a breach of contract. *See generally*, *Buttram*, 941 P.2d 71. Thus, under California law, CH Holdings is entitled to nominal damages if Temsa breached the Letter Agreement.[11]

At the hearing, Defendants argued that Plaintiffs failed to include a request for nominal damages in the SAC, and under Ninth Circuit law, this failure is fatal to CH Holdings's argument that its breach of contract claim survives because it is entitled to nominal damages. Defendants pointed to *Piabuert v. MacIntosh*, 10 F. App'x 503, 506–07 (9th Cir. 2001) in support of their argument.[12] However, *Piabuert* does not support Defendants' argument because it does not affirmatively state that a party must plead entitlement to nominal damages explicitly. Moreover, in *Yniguez v. State*, 975 F.2d 646, 647 n.1 (9th Cir. 1992), the Ninth Circuit stated that a plaintiff's complaint does not need to explicitly request nominal damages where it includes a request for relief that the court deems proper and just under the circumstances. Here, Plaintiffs explicitly ask "[f]or such other and further relief as the Court deems just and proper," SAC at Prayer ¶ 11, and thus, Plaintiffs can pursue nominal damages under *Yniguez*.

For the foregoing reasons, the Court DENIES the Motion for Summary Judgment on this ground.

### B. CH Holdings and Haggerty Have Standing to Bring Tortious Interference Claims (Claims 2 and 3).

In order for a plaintiff to bring an action in federal court, a plaintiff must show that he or she has standing under Article III. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) ("The party invoking federal jurisdiction bears the burden of establishing these elements [of Article III standing]."). To satisfy Article III's standing requirement, a plaintiff must show the following three elements:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, [Citations] and (b) actual or imminent, not conjectural or hypothetical [Citation]. Second, there must be a causal

---

[11] There is some argument scattered throughout the briefing as to whether or not certain acts by Temsa breached the Letter Agreement. However, the parties do not brief the issue in the Motion, and as such, the Court declines to rule on it at this time.

[12] At the hearing, Defendants' counsel directed the court to the "Piaubert" case, but did not provide a full citation. The only relevant case with "Piaubert" in the name found by the Court was *Piaubert v. MacIntosh*.

connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. [Citation]. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. [Citation].

*Id.* at 560–61.

"An injury . . . [is] 'particularized,' [where] it . . . 'affect[s] the plaintiff in a personal and individual way.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016). As such, "[o]rdinarily, one may not claim standing . . . to vindicate the constitutional rights of some third party." *Barrows v. Jackson*, 346 U.S. 249, 255 (1953); *see also EMI Ltd. v. Bennett*, 738 F.2d 994, 994, 997–98 (holding that shareholder owning majority stock in a corporation did not have standing to challenge Franchise Tax Board assessment proposed to be levied against the corporation).[13] As such, generally, "a shareholder cannot maintain an action for injury suffered only by the corporation," *Gomez v. Alexian Brothers Hospital of San Jose*, 698 F.2d 1019, 1021 (9th Cir. 1983).[14]

> i.  <u>CH Holdings only has standing to bring tortious interference claims concerning its relationship with Main Street.</u>

Plaintiffs claim that Temsa and TNA disrupted Plaintiffs' economic relations with Plaintiffs' clients, customers, employees, lenders, banks, or business partners. SAC ¶¶ 32, 33. Defendants argue that CH Holdings does not have standing to bring tortious interference claims against Temsa or TNA based on Defendants' alleged tortious interference with Plaintiffs' prospective economic relations because any harm that occurred as a result of Defendants' conduct was harm to CH Holdings's subsidiary, CH Bus, not CH Holdings itself. Mot. at 16. In support of their argument that CH

---

[13] There are limited exceptions to this rule that are inapplicable here, such as when an association sues on behalf of its members, *see, e.g., Associated General Contractors of America., San Diego Chapter, Inc. v. California Department of Transportation*, 713 F.3d 1187, 1194 (9th Cir. 2013), or where there is a close relationship between the named plaintiff and the third party whose rights the plaintiff seeks to vindicate *and* the third parties are somehow hindered from bringing their own lawsuit, *see, e.g., Tingley v. Ferguson*, 47 F.4th 1055, 1069 (9th Cir. 2022). Plaintiffs do not argue that either of the exceptions are applicable in this instance. *See generally*, Mot.

[14] This concept is also enshrined in California law. *See Schrage v. Schrage*, 69 Cal. App. 5th 126, 149 (2021) ("But where a cause of action seeks to recover for harms to the corporation, the shareholders have no direct cause of action '[b]ecause a corporation exists as a separate legal entity'"). Instead, such claims are properly brought as a derivative claim. *Id.*

Holdings cannot show that any of *its* relationships were disrupted, as opposed to those of CH Bus, Defendants point to several pieces of evidence showing that the clients, customers, employees, lenders, banks, or business partners at issue belonged to CH Bus or other non-parties, and not CH Holdings, which was merely a holding company:

- Employment agreement between CH Bus Sales, Inc. and Tim Guldin (Regan Reply Dec. at p. 46);

- Employment agreement between CH Bus Sales, Inc. and Randy Angell (Haggerty Decl., p. 475; *see also* PSUF ¶ 34 (undisputed that Angell was an employee and officer of CH Bus));

- Testimony from Anthony Mongiovi, Jr. wherein Mongiovi testified that he worked for CH Bus Sales from September 6, 2011 to April 16, 208 (Bucklin Decl. at p.73:15–19; *see also* PSUF ¶ 39 (undisputed that Mongiovi was an officer of CH Bus)); and

- Testimony from William Timothy Vaught wherein Vaught testified that he worked for CH Bus Sales from September 2011 to March 2018 (Bucklin Decl. at p. 136:6–14; *see also* PSUF ¶ 42 (undisputed that Vaught was an officer of CH Bus)).

In their Opposition, Plaintiffs point to two pieces of evidence that Plaintiffs contend establish a genuine issue of fact as to CH Holdings's standing—first, that Temsa called CH Holdings its manufacturing partner[15] and second, that CH Holdings's operating agreement states the CH Holdings was formed to engage in the sale and leasing of motor coaches. Mot. at 17. This evidence, however, does not create a genuine dispute of material fact for trial because it does not undermine or otherwise contradict Defendants' evidence that CH Holdings sought to vindicate the rights of other, non-named third parties as opposed to its own rights. Simply put, CH Holdings offers no evidence

---

[15] The parties dispute whether Temsa's reference to "CH Bus" in the letter refers to CH Holdings (CH Bus Holdings, LLC) or CH Bus Sales, LLC. Mot. at 18 ("The November 9, 2016 letter only vaguely references 'CH Bus' as Temsa's 'exclusive distributor in North America.' Nowhere in the letter does Temsa mention CH Holdings, let alone describe it as its manufacturing partner."). Whether Temsa's reference was to CH Bus or CH Holdings is irrelevant because, as the Court explains below, this evidence does not create a genuine dispute of material fact that Temsa or TNA disrupted an economic relationship between CH Holdings *and some other third party*, as required for a claim for tortious interference with a prospective economic relationship claim. *See Ixchel Pharma*, 470 P.3d at 575 (a plaintiff must show that "the defendant knowingly interfered with an economic relationship between the plaintiff and *some third party* . . . .") (emphasis added).

creating a genuine dispute of material fact that Temsa interfered with economic relationships between CH Holdings and a third-party as opposed to the economic relationships between CH Holdings's subsidiaries and third parties. Plaintiffs also cite to Haggerty's testimony that "all of the customers that are referred to herein [in his declaration] are customers of CH Holdings." Haggerty Decl., ¶ 17. However, Haggerty does not "offer[ ] any evidence to support these factual assertions," and a "conclusory-self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *Federal Trade Comm'n v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997).[16]

The only economic relationship CH Holdings appears to have had is that with Main Street, as CH Holdings contemplated a transaction with Main Street. *See, e.g.,* Haggerty Decl. at p. 419 (Exhibit 30, Proposal) (an agreement between CH Holdings and Main Street). As such, the Court finds that CH Holdings has standing to bring a tortious interference claim for the disruption of the relationship that it had with Main Street.

> ii.   Haggerty has standing to bring tortious interference claims.

Plaintiffs claim that as a result of Defendants' tortious interference, "Haggerty has suffered severe financial hardship, emotional distress, including but not limited to, humiliation, embarrassment, mental anguish, and profound shock to the nervous system, all to his general damage, according to proof." SAC ¶¶ 36, 46. Defendants argue that they are entitled to summary judgment as to Haggerty's claims for tortious interference because Haggerty does not have standing to bring these claims. Mot. 19.

Although, as Defendants point out, the general rule is that "a shareholder cannot maintain an action for injury suffered only by the corporation," *Gomez*, 698 F.2d at 1021, Haggerty contains that he suffered injury *as an individual*, and that this injury is separate and apart from the injury to any

---

[16] Plaintiffs also appear to point the Court to an Independent Auditor's Report reflecting a consolidated audit of CH Holdings and its subsidiaries. Mot. at 17 (citing Exhibit 3). It is unclear which Exhibit 3 Plaintiffs refer to, but given that PSUF ¶ 46 refers to the Haggerty Declaration, the Court assumes that Plaintiffs meant to cite to Exhibit 3 of the Haggerty Declaration. The auditor's report, like Temsa's statement that it considers "CH Bus" its manufacturing partner, does not show that there is a genuine dispute of material fact as to CH Holdings's standing because nothing within the audit indicates that CH Holdings had a relationship with some third party carrying the potential of an economic advantage that Temsa or TNA disrupted.

corporation. *See id.* ("The same discriminatory conduct can result in both corporate and individual injuries. [Citation]. Plaintiff alleges defendants' failure to award the emergency room contract because of his national origin has deprived him of employment as director of defendants' emergency room and caused him 'humiliation and embarrassment.' These injuries are personal to plaintiff and distinct from any injuries suffered by AES as a result of defendants' conduct.").

Defendants argue that Haggerty must show "'more than a personal economic injury resulting from a wrong to a corporation'" to succeed on his claims, and that there is nothing on the record showing that Haggerty suffered a "direct and independent injury apart from the 'harm' allegedly experienced by CH Holdings." Mot. at 20. However, there is evidence on the record creating a triable issue of fact that Haggerty suffered a direct and independent injury from CH Holdings. In his declaration, Haggerty states that Temsa's conduct "has caused me [Haggerty] personally severe emotional distress" and that he "ha[s] been traumatized." Haggerty Decl., ¶ 67. Haggerty's emotional distress injury is a separate, personal injury that is different from the injury sustained by CH Holdings (the collapse of a transaction). *See Nelson v. Anderson*, 72 Cal. App. 4th 111, 124–25 (1999) ("While we agree that in some cases, the same facts regarding injury to the corporation may underlie a personal cause of action, such as intentional infliction of emotional distress, breach of contract, fraud, or defamation, Nelson has not alleged or proved the elements of any such cause of action.") From the evidence on the record, a jury could reasonably reach the conclusion that Haggerty experienced emotional distress separate from the economic injury that CH Holdings experienced when the Main Street Transaction fell apart. [17]

Defendants also argue that the record is devoid as to any calculation or amount of damages Haggerty has suffered, Mot. at 20, but that is not a standing issue, as nothing in Article III requires a firm calculation. *See Defenders of Wildlife*, 504 U.S. at 560–61 (listing requirements of Article III

---

[17] The Court notes that Plaintiffs cited several cases discussing the covenant of good faith and fair dealing and how shareholders can recover for emotional distress in the insurance context where the company is the insured. *See* Mot. at 21 (citing *Truestone, Inc. v. Travelers Ins. Co.*, 55 Cal. App. 3d 165, 169 (1976)). Such cases are not relevant to whether Haggerty has standing here, as his claims do not arise in the insurance context under the implied covenant of good faith and fair dealing.

standing).[18] For the foregoing reasons, the Court finds that Haggerty has standing to bring tortious interference claims. The Court thus DENIES the Motion on this basis.

### C. Defendants are Entitled to Partial Summary Judgment on Plaintiffs' Tortious Interference with Prospective Economic Relationship Claim (Second Claim).

A plaintiff asserting a claim for tortious interference with prospective economic relations must show "that the defendant knowingly interfered with an economic relationship between the plaintiff and some third party, [which carries] the probability of future economic benefit to the plaintiff." *Ixchel Pharma, LLC v. Biogen, Inc.*, 470 P.3d 571, 575 (Cal. 2020) (internal quotation marks omitted). The California Supreme Court has stated that "as a matter of law, a threshold causation requirement exists for maintaining a cause of action for" tortious interference, "namely, proof that it is reasonably *probable* that the lost economic advantage would have been realized but for the defendant's interference." *Youst v. Longo*, 729 P.2d 728, 733 (Cal. 1987).

As the Court has already discussed above, CH Holdings and Haggerty cannot bring tort claims on behalf of third parties for injuries suffered by those third parties alone. *See supra*, § IV(A)(i). As such, the only relationship at issue for tortious interference is that between CH Holdings and Main Street.[19] At the hearing, Defendants also argued that Haggerty cannot bring a tortious interference claim because he does not point to any relationship of *his* that was interfered with.[20] Haggerty argued that he does point to such a relationship—his relationship with Main Street. Haggerty asserted that he had an economic relationship with Main Street because, had the Main Street Transaction been consummated, Haggerty would have received a financial benefit. The record

---

[18] Moreover, given the Court's holding that Haggerty cannot bring a claim for tortious interference with prospective advantage, *infra*, it is unnecessary for the Court to address the issue of whether Haggerty's tortious interference claim should be dismissed for his failure to offer competent evidence of damages.

[19] Even if CH Holdings had a relationship with Google, Plaintiffs do not dispute that Google decided to stop leasing Temsa motorcoaches from CH Bus after it complied with the terms of its lease agreements with CH Bus because most of Google's fleet of motorcoaches were from a different manufacturer. DSUF ¶¶ 26–28. As such, it is undisputed that Google's decision to stop leasing from CH Bus was ground in a business reason, not any alleged interference from Temsa.

[20] Defendants originally mounted this argument as one going to Haggerty's standing. However, this issue is not one of standing, but of Haggerty's inability to satisfy the elements of his claim.

1  shows that Main Street contemplated acquiring membership interests in CH Holdings and its

2  subsidiaries for a total purchase price of $20,000,000. Regan Decl. at p. 223 (Exhibit 14, LOI).

3  About $3,600,000 of that amount would go to Haggerty in the form of equity in NewCo, an entity

4  formed by Main Street to acquire the issued and outstanding membership interests of CH Holdings.

5  *Id.* Although Haggerty would have financially benefited from this transaction, that benefit does not

6  show that there was an economic relationship between Haggerty and Main Street as opposed to one

7  between CH Holdings and Main Street. [21] Because Haggerty cannot show an essential element of his

8  claim, the Court finds that Defendants are entitled to summary judgment on Haggerty's claim for

9  tortious interference of economic advantage.

10        Defendants point to evidence they contend establishes that the Main Street Transaction did

11  not fall through due to Temsa's alleged interference. Regan Decl. at pp. 307:16–308:1 (Exhibit 20,

12  Braud Deposition) (stating that although "Temsa's lack of consent was a contributing factor" to the

13  decision, it "was not the sole factor in our [Main Street's] decision to not further pursue the

14  transaction."), 303:21–25 (Exhibit 20, Braud Deposition) (one of the conditions of finalizing the

15  Main Street Transaction was CH Holdings's procurement of satisfactory floor plan financing),

16  303:11–14 (Exhibit 20, Braud Deposition) ("Q: . . .[H]ad there been a ability to obtain a satisfactory

17  floor plan loan would Main Street have had a willingness to continue discussing the deal with CH

18  Bus Holdings, if you recall? A: Presumably . . . . But certainly the floor plan financing was a game

19  plan"), 277 (Exhibit 18, email chain) ("We should not signal to Temsa that a deal with MSC is hung

20  up on a flooring issue"). Despite this evidence, a reasonable jury could find that Main Street may

21  have waived the floorplan financing condition if not for Temsa's interference, as Braud noted that

22  Temsa's "consent" was an important factor in Main Street's decision. Regan Decl. at pp. 307:16–

23  308:1 (Exhibit 20, Braud Deposition) (stating that although "Temsa's lack of consent was a

24  contributing factor" to the decision, it "was not the sole factor in our [Main Street's] decision to not

25

26      [21] The Court notes that Haggerty's argument would essentially collapse two separate elements of a tortious

27  interference with prospective economic relationship claim into one, as, under Haggerty's theory, the prospect of future economic benefit would show both that an economic relationship existed between the plaintiff and a

28  third party and that there was a probability of future economic benefit to the plaintiff. *See Ixchel Pharma*, 470 P.3d at 575 (listing elements of a tortious interference claim).

further pursue the transaction.").[22] Moreover, that the LOI and the Proposal were non-binding is beside the point, as a tortious interference claim does not require that the parties be in a contractual relationship but only that they have an economic relationship. Regan Decl. at pp. 229 (Exhibit 14, LOI), 270 (Exhibit 17, Proposal); *Ixchel Pharma*, 470 P.3d at 575 (elements of a tortious interference claim). While the LOI and Proposal are non-binding, they show that there was an economic relationship between CH Holdings and Main Street that "carried the probably of future economic benefit to" CH Holdings. *Ixchel Pharma*, 470 P.3d at 575. At the hearing, Defendants also argued that Temsa never actually withheld its consent, but that argument misses the mark. Even if Temsa did not actually withhold its consent, the concern that Temsa may do so (brought on by Temsa's actions) could constitute interference that resulted in the collapse of the Main Street Transaction.

The Court also notes that Plaintiffs point to *Reeves v. Hanlon*, a California Supreme Court opinion discussing "whether a defendant may be held liable under an intentional interference theory for having induced an at-will employee to quit working for the plaintiff," as being "remarkably on point" to the current action. 95 P.3d 513, 514 (Cal. 2004); Mot. at 26. However, that case concerned the viability of tortious interference claims in the context of at-will employment contracts. *See* 95 P.3d at 516–17 ("What is disputed is the Court of Appeal's legal conclusion that 'an employer may recover for interference with the employment contracts of its at-will employees by a third party when the third party does not show that its conduct in hiring the employees was justifiable or legitimate.'"). To the extent *Reeves* is on-point, it would be on-point insofar as CH Holdings bases its tortious interference with prospective economic relationships claim on its relationships with its

---

[22] At the hearing, Defendants argue that the consent Braud referred to in his deposition was Temsa's consent to the Main Street Transaction and the potential that Temsa would also purchase some shares in CH Holdings or one of its subsidiaries. However, in his declaration, Haggerty testifies that "Temsa's consent" referred to is Temsa's consent to extend the Distribution Agreement. Haggerty Decl. at p. 12 ¶ 47. There is no evidence on the record contradicting Haggerty's interpretation, and indeed, in light of Defendants' statements at the hearing that a manufacturer's consent is generally part of mergers and acquisitions, Haggerty's interpretation appears to be correct—that is, part of the value of the acquisition for Main Street lies in Temsa's consent to extend the Distribution Agreement so that NewCo can continue selling Temsa motorcoaches. Moreover, Braud's testimony does not explicitly state what Braud means by Temsa's consent, and a reasonable jury could interpret "Temsa's consent" as referring to Temsa's consent to extend the Distribution Agreement.

1    employees. As discussed, however, CH Holdings cannot maintain such an action because the

2    employees at issue were those of a third-party, and CH Holdings does not have Article III standing

3    to bring such an action.

4        Plaintiffs also cite to California Penal Code section 641.3, which prohibits commercial

5    bribery by an employee. Cal. Pen. Code § 641.3(a). Plaintiffs argue that "Angell and Stadler, by

6    using their personal e-mails to hide their illicit communication with CH Holdings and Mr.

7    Haggerty's manufacturer, clearly show their corrupt motivation." Mot. at 26. It is not apparent why

8    Plaintiffs cite to California Penal Code section 641.3, as that section relates to commercial bribery

9    by an employee, which is not a claim in this action. To the extent that Plaintiffs are attempting to

10   argue that Angell and Stradler's conduct allegedly constituting commercial bribery constituted a

11   tortious interference, Plaintiffs do not point to any evidence that Angell and Stradler were agents of

12   Temsa or TNA at the time of the conduct, or that Angell and Stradler's actions can otherwise be

13   imputed to Temsa or TNA for their tortious interference claim. To the extent that Plaintiffs are

14   attempting to argue that Temsa or TNA interfered with Plaintiffs' relationships with Angell and

15   Stradler, as evidenced by Angell and Stradler's alleged engagement in commercial bribery, the

16   argument fails because Plaintiffs do not point to any evidence that Plaintiffs had employment

17   relationships with Angell[23] or Stradler, a required element of their claim. *See Ixchel Pharma*, 470

18   P.3d at 575 (plaintiff must show "that the defendant knowingly interfered with an economic

19   relationship *between the plaintiff and some third party* . . . .").

20       Finally, Plaintiffs argue that commercial bribery is prohibited by federal antitrust laws, and

21   that "[a]ctionable civil racketeering creates a 'general harm to competition.'" Mot. at 26. This

22   appears to be an argument meant to address Defendants' statement that "[a] plaintiff must prove

23   'that the defendant not only knowingly interfered with the plaintiff's expectancy, but engaged in

24   conduct that was *wrongful by some measure other than the fact of the interference itself*,'" Mot. at

25   24 (emphasis added), as it appears that Plaintiffs are arguing that Defendants' conduct was wrongful

26   under federal law in addition to being an interference with Plaintiffs' prospective economically

27

28

---

[23] Indeed, it appears that Plaintiffs concede that Angell was an employee of CH Bus. PSUF ¶ 34.

advantageous relationships. However, even assuming that Defendants' conduct was wrongful, this argument does not address Defendants' argument that Plaintiffs cannot show that Defendants' conduct actually disrupted any of *Plaintiffs'* economic relationships (as opposed to those of a third party), a necessary element of the claim.

In light of the foregoing, the Court GRANTS the Motion as to Haggerty's claim for tortious interference with prospective economic advantage but DENIES the Motion as to CH Holdings's claim for tortious interference with prospective economic advantage.

### D.  TNA Cannot Be Held Liable for Tortious Interference.

Defendants also argue that TNA cannot be held liable for tortious interference (claims 2 and 3) because it did not exist when the alleged tortious conduct occurred. Mot. at 29.

Generally, a corporation is not liable for acts undertaken prior to its organization. *See* Witkins Corporations, § 63 ("The acts of the promoters do not bind the corporation prior to its organization, for until it comes into existence it cannot be a principal. Nor does the mere formation of the corporation render it liable on the contracts of promoters."). Here, TNA was incorporated on June 29, 2018, Regan Decl. at p. 348 (Exhibit 23), and the Main Street Transaction fell through in 2017—before TNA's incorporation—so TNA cannot be held liable for claims based on the collapse of the Main Street Transaction. Mot. at 29–30.[24] In response, Plaintiffs argue that their tortious interference claims are broad, and encompass the deterioration of other relationships, such as that between Angell and Plaintiffs. Mot. at 30. However, Angell was not an employee of either Haggerty or CH Holdings, and as such, Plaintiffs cannot bring a tortious interference claim based on Angell's departure to TNA. Thus, the Court finds that TNA cannot be held liable for tortious interference and GRANTS the Motion on this basis.

/ / /

---

[24] There are some exceptions to the general rule concerning corporate liability for pre-incorporation acts, *see* Witkins Corporations, § 63, but Plaintiffs do not provide any argument concerning the applicability of these exceptions. *See* Mot. at 30.

### E.   Temsa Is Not Entitled to Summary Judgment on the Basis That It Is Not a Stranger to the Relationships with Which It allegedly Interfered.

Defendants also argue that Temsa is entitled to summary judgment on Plaintiffs' tortious interference claims (claims 2 and 3) because Temsa had a legitimate and direct relationship to the relationships with which it interfered. Mot. at 32. In support of this argument, Defendants cite to *Marin Tug & Barge*, a case where the Ninth Circuit noted that "California law has long recognized that the core of intentional interference business torts is interference with an economic relationship by a third-party stranger to that relationship, so that an entity with a direct interest or involvement in that relationship is not usually liable for harm caused by pursuit of its interests." *Marin Tug & Barge, Inc. v. Westport Petroleum, Inc.*, 271 F.3d 825, 832 (9th Cir. 2001). In *Marin Tug & Barge*, the Ninth Circuit held that Shell could not held liable for tortious interference of Marin Tug's contracts with third parties based on a refusal to deal because Shell was not a stranger to the relationship between Marin Tug and relevant third parties but had a direct interest in these relationships. *Id.*

Since *Marin Tug*, the Ninth Circuit has clarified that *Marin Tug* does not extend to intentional interference with contract claims. *United Nat. Maintenance, Inc. v. San Diego Convention Center, Inc.*, 766 F.3d 1002, 1007–08 (9th Cir. 2014) ("Since *Marin Tug* did not specifically address the tort of intentional interference with contract, the scope of that tort remains an open question in this circuit. We 'must follow the state intermediate appellate court decision[s] unless [we] find[ ] convincing evidence that the state's supreme court likely would not follow it.' [Citation]. SDC points to no convincing evidence that the California Supreme Court would change its long held position on the potential tort liability of strangers to a contract.") (internal citation omitted).

Moreover, in *Fresno Motors*, the Ninth Circuit acknowledged that, following *Marin Tug*, "several decisions of the California Courts of Appeal have rejected *Marin Tug's* interpretation of *Applied Equip.*, concluding that *Applied Equip.* should be limited to its specific holding that only parties to a contract are excluded from asserting an intentional interference claim." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1126 (9th Cir. 2014). The Ninth Circuit acknowledged that the "viability of the 'not-a-stranger' principle relied on by the district court [from

*Marin Tug*] is in a state of flux, and there is no indication that the California Supreme Court will clarify it any time soon." *Id.* In *Woods*, the California Court of Appeal examined *Marin Tug*, and noted that "the three decisions cited by *Marin Tug* for the immunity of those with a direct interest in someone else's contractual relationship in fact have no bearing on that issue." *Woods v. Fox Broadcasting Sub., Inc.*, 129 Cal. App. 4th 344, 355 (2005). "As a result," the *Woods* court "conclude[d] that *Marin Tug* did no more than evaluate the wrongfulness of Shell's conduct in the context of its relationships with Marin Tug and the tug company's customers and was not extending immunity from contract interference claims to an even broader, more attenuated class of persons." *Id.* This Court's duty is to "predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *In re Kirkland*, 915 F.2d 1236, 1238 (9th Cir. 1990). "[I]n the absence of convincing evidence that the highest court of the state would decide differently, [citation] a federal court is obligated to follow the decisions of the state's intermediate courts." *Id.* (internal quotation marks omitted). Given the wide disagreement with *Marin Tug*, this Court finds that the "not-a-stranger" principal is not an absolute shield to a tortious interference with prospective economic advantage claim. While there may be some situations in which a wrongful motive cannot be shown because of the party's interest in the relationship, the Court declines to read *Marin Tug* as precluding all tortious interference claims where the party alleged to have interfered has some interest in the relationship. *See Marin Tug*, 271 F.3d at 834–35 ("The Mudgetts' intentional interference claim depends entirely, then, upon a showing that Shell acted with a wrongful motive.").

Here, a jury may find that Temsa had a wrongful intent in interfering with Plaintiffs' relationships. The evidence shows that Capello felt that "Temsa . . . [was] seeking to be obstructionist with no real intention to close,." which could indicate a potential wrongful motive on Temsa's part to delay or otherwise sabotage the Main Street Transaction. Haggerty Decl. at p. 402 (Exhibit 29, email chain). As such, the Court DENIES the Motion on this basis.

/ / /

**F.  Defendants are Entitled to Summary Judgment on Plaintiffs' Tortious Interference with Contractual Relations (Claim 3).**

"To state a claim for tortious interference with contractual relations, a plaintiff must allege: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) *actual breach or disruption* of the contractual relationship; and (5) resulting damage." *Rincon Band of Luiseno Mission Indians etc. v. Flynt*, 70 Cal. App. 5th 1059, 1110 (2021) (emphasis in original). The fourth element is met if the defendant's conduct "induces an actual breach of plaintiff's contract, or 'if plaintiff's performance is made more costly or more burdensome.'" *Id.*

Defendants argue that they are entitled to summary judgment on Plaintiffs' claim for tortious interference with contractual relations because, amongst other deficiencies, Plaintiffs cannot point to any evidence showing the required element that Temsa or TNA's conduct caused actual breach or disruption of a contractual relationship between either Haggerty or CH Holdings, on the one hand, and a third-party, on the other hand. Mot. at 28. In opposition, Plaintiffs only state that "Starting with David Thomas Tours, Temsa interfered with numerous contracts. Google was a customer that generated at least $100,000 in monthly revenue (UF 53)." Mot. at 28. However, Plaintiffs do not point to any evidence on the record showing that a valid contract existed between Haggerty or CH Holdings on the one hand, and Google or David Thomas Tours on the other hand, a required element of this claim. Plaintiffs also do not point to any evidence showing that Temsa's conduct caused either an actual breach or a disruption of the contractual relationship with Google or David Thomas Tours. Indeed, it is undisputed that Google decided to stop leasing Temsa motorcoaches from CH Bus *after it complied with the terms of its lease agreements with CH Bus* because most of Google's fleet of motorcoaches were from a different manufacturer. DSUF ¶¶ 26–28. As such, there was no breach or disruption of the Google contract. As for David Thomas Tours, Plaintiffs do not point to any evidence on the record from which the Court can find that there is a triable issue of fact that Plaintiffs had a contract with David Thomas Tours. *See Carmen*, 237 F.3d at 1029 (a district court need not "comb the record" looking for evidence, it is only required to consider the evidence set forth the in the moving and opposing papers and the portions of the record cited therein").

For the foregoing reasons, the Court GRANTS the Motion on this basis.

**VI.    Conclusion**

For the foregoing reasons, the Court hereby ORDERS as follows:

1. The Court SUSTAINS Defendants' objections to Exhibits 28, 32, 35, 47, and 49 of the Haggerty Declaration;

2. The Court SUSTAINS the objections to Exhibits 3, 11, 12, and 13 of the Regan Declaration and Exhibit 3 of the Regan Reply Declaration.

3. The Motion is GRANTED as to Plaintiffs' tortious interference with contract claim (claim 3);

4. The Motion is GRANTED as to Haggerty's claim for tortious interference with prospective economic advantage (claim 2);

5. Plaintiffs' tortious interference with prospective economic advantage claim is DISMISSED as to TNA;

6. The Motion is DENIED as to CH Holdings's claim for breach of contract (claim 1) on the basis that CH Holdings may be entitled to nominal damages; and

7. The Motion is DENIED as to CH Holdings's claim for tortious interference with prospective economic advantage (claim 2).

IT IS SO ORDERED.

Dated: October 15, 2024                    _____

                                          MAAME EWUSI-MENSAH FRIMPONG

                                          United States District Judge